UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

Gary White, et al.

    Plaintiffs,

                          CASE NO.: 8:04-CV-01227-T-26EAJ

vs.

The Polk County, a municipal corporation; et. al

    Defendants.
_____/

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PROPER MUNICIPALITY HAS BEEN SUED

Plaintiffs have filed suit against the county and several officers at the Polk County Sheriff's Office (hereinafter PCSO), including Sheriff Crow, Lieutenant Zimmerman and former Sgt. Scott Lawson in their individual and official capacities. As defendants recognized in their Motion for Summary Judgment, "it is well established that suits against an official in his or her official capacity are suits against the entity that the individual represents." Monell v. Dep't of Social Services, 436 U.S. 658, 691 n. 55 (1978); see also, Parker v. Williams, 862 F.2d 1471, 1476 n. 4 (11th Cir. 1989).   Even if defendant is correct that the proper party to sue in this matter is the PCSO, not Polk County, by suing defendants-Sheriff Crow, Zimmerman and Lawson in their official capacities, the proper party has been sued by operation of law.  Notwithstanding that, the 11th Circuit has recently rejected defendants' argument here.  Abusaid v. Hillsborough County Board of Comm'rs, et al., 405 F.3rd 1298 (11th Cir. 2005), pointing out among

1

other things, that the Florida Constitution labels sheriffs "county officers". Fla. Const. art. VIII, Section 1(d).

Plaintiffs alleged that defendant Lawson was a policymaker and that his conduct here is therefore attributable to his employer. None of the defendants, including Lawson, have raised this issue in the motion for summary judgment. Thus, if plaintiffs can show that Lawson's chase violated Miles White's constitutional rights, than the County is responsible therefore. St. Louis v. Praprotnik, 108 S.Ct. 915 (1988).

SHOCKING THE CONSCIENCE-UNDERLYING CONSTITUTIONAL VIOLATION

Defendants next argue that there is no material issue of fact that Lawson's 15.8 mile chase of Miles White does not shock the conscience as required under Sacramento v. Lewis, 523 U.S. 833 (1998). The shocking the conscience standard only applies if the conduct at issue is a "pursuit". Id. While defendants in their motion are calling Lawson's chase of Jacoby/White a pursuit, in all other aspects-they were specifically not calling it a pursuit. Defendants have been taking the position that Lawson's chase was not a pursuit because defendant-Lawson failed to call it a pursuit. (Katsaris depo at 7-9). See also, Major Gary Hester's deposition at pp. 33-5). PCSO's pursuit policy, General Order 41.3 requires that the pursuit supervisor prepare a pursuit critique. (Ex. 1 at D. 9). No pursuit critique was done in this matter, again, primarily because defendant-Lawson never declared that he was in pursuit (Zimmerman depo at 37).

Notwithstanding the position that the PCSO is taking in this case, in other cases, the PCSO has taken a different position as to whether a pursuit can only take place if the pursuing officer declares it a "pursuit". For example, defendant-Holleyman's memo to Wayne Cross, in another pursuit, clearly shows that other pursuit supervisors and

2

dispatch declared a chase to be a pursuit even though the patrol officer had not declared it to be a pursuit and the supervisor in that particular matter terminated the pursuit. (See Ex. 26). As will be explained below, the fact that the PCSO's employees are not applying the most salient portions of G.O. 41.3 is cause for special training on pursuits, not only to patrol officers, but also to supervisors in their supervisory capacity, in order to generate an consistent and understandable policy.

The evidence in this case shows that at 1:12 a.m., dispatcher Erica Jouppi asked defendant- Sgt. Scott Lawson if he was going to initiate a pursuit, by stating "you gonna get me a 10-31". (Jouppi depo at pp. 12-13 and ex. 1 attached thereto). His response was "I'm trying, but it is sure dead". At 2:47 a.m., Lawson first reports to dispatch if they "can you check signal 10 list for a black Volkswagen Jetta, I'm eastbound ….with the vehicle trying to lose me". Dispatch reported almost immediately that the vehicle was not stolen. (Ex. 3 at p. 5 of 31). The transcript of the dispatch communications between Lawson and dispatch show that he knew that there were two white males in the Volkswagen Jetta, that he had no justification for chasing the vehicle except to see if the vehicle was stolen, and that dispatch quashed his suspicion twice by saying that the vehicle had not been reported stolen. Lawson at one point during this high speed chase was close enough to read Jacoby's license tag. The transcript shows that Lawson reads the tag to dispatch who quickly reports "Sarge its clear….it's not reported." Seconds later, Lawson states "I'm…oops….well they just signal 4'd." All of these communications were heard by defendant-Zimmerman, who said and did nothing. There were no warrants for Jacoby or Miles White's arrest and as a matter of law there was no reasonable suspicion for even a stop.

3

Defendant-PCSO investigated the fatality and their investigators found factually that Lawson, in an unmarked patrol car, followed the Volkswagen, driven by 18 year old Adam Jacoby with 16 year old Miles White seated as a passenger, for 15.8 miles, never once activating his emergency signals or otherwise trying to execute a stop, with Lawson's vehicle average approximate speed of 104-109 MPH during the last portion of the chase and that another officer from another jurisdiction who also was involved for a short stretch reported their speeds to be in excess of 120 MPH. (Ex. 14-15, see also Ex. 4).

Captain Ray Church for the PCSO issued a report finding Lawson was in violation of policy stating effectively that if he would have tried to execute a stop, this entire event would not have happened. (Ex. 4).

Despite the fact that defendants in this case and in their recordkeeping refuse to call Lawson's high speed surveillance a pursuit, the transcript of Lawson during the chase shows that the first words out of his mouth were that Jacoby was "trying to lose him". Immediately after the accident, other officers begged to differ as to whether it was a pursuit or not. (See Ex. 24).   See also, Ex. 1, Glossary-Definition of "Pursuit"

Legally, if the chase is not a pursuit-than the "shocking the conscience" standard of <u>Sacramento</u>, 523 U.S. 833 (1998) does not apply and the plaintiffs need only show that Lawson's chase was deliberately indifferent or unreasonable.    While defendant is taking the position that Lawson's vehicle never hit the plaintiffs' vehicle, Lieutenant Zimmerman, who was required to be supervising Lawson's chase, went to the scene of the accident and immediately had Lawson's vehicle removed, despite the fact that defendant's traffic fatality policy 63.1 specifically states that in the event that there is a

4

fatality … involved in a crash, deputies at the scene shall make every effort to leave the scene, including the vehicles, undisturbed until traffic fatality investigator arrives. (Ex. at E.7; Ex. 18 at p. 3).    Teresa Edministon visited Lawson at the hospital shortly thereafter and testified that they were concerned about what to do with Lawson's vehicle. (Edministon depo at p. 13).   According to witnesses, Zimmerman appeared very stressed.   (Ex.   24).    Lawson's vehicle was not inspected by a traffic fatality investigator for five days after the incident. (David Hooyman depo at 58-9, Zimmerman depo at 28-32).      Clearly there are questions of fact as to whether Lawson's vehicle was modified or fixed to cover up any evidence that his vehicle struck Jacoby's as it is clear that from the time that Zimmerman caused it to be moved and the time that a traffic investigator, five days later, there was plenty of opportunity to remove any evidence that the vehicles collided.   There are also questions of fact as to whether the chase was a legal "pursuit", chase, surveillance, an act of terror or something that only a jury could decide. See Harris v. Coweta County, Ga., 433 F.3d 807 (11th Cir. 2005) for example of analysis when there is contact in a pursuit.

Whether the Court applies the shocking the conscience standard, the deliberate indifference standard, or the 4th Amendment reasonableness standard-the plaintiffs clearly have demonstrated a material issue of fact at even the most difficult of the standards.  Shocking the conscience is clearly a question of fact.    The Sacramento case, in clarifying the issue, cited to an earlier decision Cheki v.Webb, 785 F.2d 534 (5th Cir. 1986) as a situation where  the pursuit shocked the conscience.    The Cheki case is instructive in that like this case, both police officers were driving unmarked vehicles and at no time identifying themselves as law enforcement.    The Sacramento Court went on

5

to hold that a pursuit shocks the conscience when there is evidence that the police officer intends to worse the driver's legal plight.   Defendant Lawson was asked that question in his deposition and raised his Fifth Amendment Privilege and refused to answer the question.   See, Baxter v. Palmigiano, 425 U.S. 308 (1976); United States v. A Single Family Residence, 803 F.2d 625, 629 (11th Cir. 1986); and Fed. R. Evid. 801(d)(2)(D); Cerro Gordo Charity v. Fireman's Fund, 819 F.2d 1471 (8th Cir. 1987)(even though the employee relationship has been terminated, the inference is still drawn against the employer).

Even defendants' traffic fatality investigator admits that the chase was shocking. (Hooyman deposition at pp.  116-117).   Clearly, there are factual questions as to what were Lawson's intentions in chasing someone in an unmarked vehicle at night, due to his suspicion that the vehicle might be stolen-even though dispatch told him twice it was not, during a chase that covered 15.8 miles at speeds exceeding 110 MPH.

FAILURE TO TRAIN

In 1989, the Supreme Court set forth the standard to show deliberate indifference for failure to adequately train and stated that such claim could be shown where in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, than the municipality is said to be deliberately indifferent. Alternatively, plaintiffs can prove deliberate indifference through failure to adequately train when there is pattern of unconstitutional conduct so pervasive as to imply actual or constructive knowledge on the part of policymakers.   City of Canton v. Harris, 489 U.S. 388-392 (1989).   The Supreme Court noted that when there is an obvious need for

6

certain training and that training is not provided, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  Bd. Of County Comm'rs v. Brown, 520 U.S. 397, 409 (1997)(a single incident accompanied by a failure to train in recurring situations which present an obvious potential for a violation can be deliberate indifference).   As the Board of County Comm'rs case explains, once you have shown deliberate indifference, there is an inference that the conduct giving rise to the deliberate indifference caused the injury.   When situations are frequently recurring and present difficult choices that could lead to constitutional violations, the plaintiff need not show a prior pattern of misconduct.   Young v. City of Augusta, Georgia, 59 F.3rd 1160, 1172 (11th Cir. 1995).

In this case, plaintiffs can show disputed facts that there was an obvious need for additional training on pursuits.   The need for such additional training was acknowledged for several years by the PCSO, but rejected a few times over a few years for financial and other purported reasons.   The day of this incident, the PCSO finally committed to the additional training.   Additionally or alternatively, there are clearly issues of fact on whether there were prior constitutional violations stemming from pursuits that the PCSO knew or should have known.

Plaintiffs' claims against the county or against individuals in their official capacity are notice pleading, and allege that there was both an obvious need for additional training on pursuits and that the defendant knew that they needed additional training due to prior constitutional violations.   Defendants do not contend in their

7

statement of undisputed facts that there was no need to train on pursuits nor that there was no prior constitutional violations.

It was well know before this incident that pursuits are very dangerous and could lead to the loss of life.   (See Ex. 1 and Ex. 2-Section III, See Ex. 17 and 19, Hester depo at p. 20, Zimmerman depo at p. 39).    As early as 1987, the PCSO acknowledged this danger when it stated in its Standard Operating Procedure 87-002, Emergency Vehicle Operation, Pursuit and Traffic Stops that "some pursuits may be necessary, however, only a small percentage actually involve serious crimes.   The greater portion of vehicle pursuits ends in accidents, injury or death."   (Ex. 1).   .

In 1997, the U.S. Department of Justice, through its National Institute of Justice, issued a report entitled Police Pursuit Policies and Training which expressly warned law enforcement about the lack of training on pursuits and recommended continuous training on the subject.   (Ex. 17 and 19).    The International Association of Chiefs of Police had published an extensive training bulletin on pursuits in 1998.   (Ex. 17).   That year, the United Supreme Court  published its Sacramento decision which clearly shows how dangerous an activity pursuits are including the split second decisionmaking that is required.

Defendants are taking the position that Lawson received training on pursuits at the police academy in 1991, in 1992 during his field training phase, in 1998 when he applied to become a sergeant in 1998, and then some roll call training.   Defendant does not present any evidence to verify any of these assertions.   Defendants filed no curriculum, course plans, or other evidence to show that Lawson was actually trained in pursuits at any of these stages or what training he was provided.

8

Defendant-Lawson was hired by the PCSO in 1991.(Ex. 25)    After 1998, he became a sergeant and began supervising other deputies pursuits.   According to his training records, from 1995 to May 2002, there was no training provided to him on pursuits or emergency vehicle operations.   (Ex. 25).    He testified that he received no training on his supervisory responsibilities for pursuits as well.   (Lawson depo at 47).

Lawson testified that he did not receive any training on pursuits during any of these phases and that he and supervisors discussed the need for additional training on pursuits.    As to the roll call training, he testified that all that would occur would be someone, either himself or a supervisor, reading the pursuit policy verbatim.  As to the training to become a sergeant, he again testified that he did not get training on pursuits and that the training was primarily focused on criminal investigations.     Lawson also testified that he was never tested in his knowledge on pursuits.   (Lawson depo at 46).

The record supports Lawson's testimony and demonstrates that the PCSO was not providing any meaningful training on pursuits.   The PCSO cannot show any lesson plans or curriculum regarding pursuit training that was in existence prior to 5/31/02.   As early as 1998, the defendant-PCSO readily acknowledged the need for additional training on pursuits-or EMERGENCY VEHICLE OPERATIONS COURSE.   A review of exhibits 5-6, shows that PCSO acknowledged such need for training, but made a conscience choice not to provide such training-until May 31, 2002 when they finally committed to such training.   The reasons for not providing such training included financial reasons. (See Composite Ex.5, August 01 training committee meeting).   The PCSC serves a little more than 500,000 individuals.   Prior to this incident, the PCSO spent no money on

9

training for pursuits, outside what is earmarked for its general training. (Hester depo. at 12-13, 56).

Exhibit 7 is a lesson plan for the EVOC training which shows proper training on this highly risky activity of pursuit, including both when to initiate pursuits and actual course training. The evidence of the decision to do the proper training after 5/31/02 is admissible under the subsequent remedial evidence rule to show feasibility of the training program during the relevant timeframe. Fed. R. Evid. 407.

Defendants also conduct quarterly and annual reviews of their pursuits purportedly to determine whether there is a need to conduct training on pursuits. The yearly review conducted by Hester following this incident does not account for Lawson's chase of Jacoby and the resulting loss of life. (Ex. 8). Hester's report concludes by saying no additional training is needed, despite the event that gave rise to this litigation. Hester's report annual report clearly does show that pursuits, at least those activities that the PSCO acknowledges as pursuits as opposed to high speed surveillance, were a recurring event for the PCSO which caused property damage and injuries. Another annual pursuit analysis for one of the divisions for the PCSO shows 33% of the pursuits violating policy, yet the author of the report goes on to blindly say-no additional training is needed. (Ex. 9). Defendants avoid the problems of keeping records of problematic pursuits and resulting constitutional violations by characterizing the event as a non-pursuit. Major Hester testifies that because Lawson did not call it a pursuit, it was not a pursuit.

The evidence in this case shows a pursuit policy that is vague on its face as to when an officer is entitled to conduct a pursuit. The policy authorizes the officer to

conduct a high speed pursuit "when the need for apprehension outweighs the risk". The policy goes on to list several factors to purportedly help assist the officer know when the pursuit is justified, including "time of day, road conditions". However, neither the policy nor the training explain how any of these factors are utilized to determine whether there is a need for apprehension or whether the pursuit should continue. Further heightening the danger involved with this policy is that the evidence shows that different supervisors had different interpretations as to when a pursuit was justified. (See Lawson depo at 10, Ex. 18, p. 11). To compound the problem regarding this vague high risk policy is the fact that there is a dispute amongst supervisors as to whether they have the authority to override a patrol officer who refuses to declare a high speed chase a pursuit. (Ex. 26 vs. Hester depo at 33-35). That difference amongst supervisors is critical in that in this case, defendant-Zimmerman essentially is taking the position that he could not do anything while supervising Lawson's 15.8 mile chase because Lawson refused to call it a pursuit.

Reading the evidence in the light most favorable to the plaintiffs, there were constitutional violations predating this crash. (Hooyman deposition at p. 45; Lawson depo at p. 11, Ex. 8 and 9 (both of which show injuries and property damage resulting from pursuits, as well as improper pursuits)). Lawson testified that the subject of roll call training was up to the supervisor's discretion and that the subject matter would often be dictated when problems arose due to a particular issue. (Lawson depo. at 19). The fact that the defendants' records show several roll call training on pursuit prior to 5/31/02 is further proof of that the PCSO knew or should have know of the pattern of constitutional violations resulting from pursuits predating this incident.

Hester's 2002 annual pursuit analysis for the PCSO fails to include this particular crash and loss of life. Such recordkeeping failure shows the PCSO's recordkeeping on pursuits is significantly deficient and raises the inference that there is widespread constitutional violations flowing from pursuits. Additionally, the PCSO's pursuit policies as far back as 1987 expressly admit this when the policy states that a "greater portion of pursuits end in accidents, injury or death." (Ex. 2).

One district court has already denied summary judgment on a failure to train case where there was little training on pursuits and, like our case, the patrol officers had not been tested on pursuits. Hockenberry v. The Village of Carrollton, 110 F.Supp.2d 597 (N.D. Ohio 2000).

Two 11th Circuit cases on failure to train case are also highly instructive here. Kerr v. City of West Palm Beach, 875 F.2d 1546 (11th Cir. 1989). Like the vague pursuit policy that defines what circumstances enables an officer to conduct a pursuit, the City of West Palm Beach had a policy that enabled officers to use canines to apprehend fleeing suspects suspected of "serious misdemeanors". The 11th Circuit recognized that since there was no definition of "serious misdemeanors", that the policy enabled the officers a very broad amount of discretion in terms of when they used canines to apprehend fleeing felons. Here, pursuit officers also have broad discretion as to when they apprehend, not only fleeing felons, but anyone including misdemeanants-so long as they deem the "need for apprehension" to outweigh the dangers. Theoretically, such authority would enable a police officer to chase down anyone at 120 MPH just to verify whether they own the vehicle they are driving-which is exactly what happened here.

The 11th Circuit reversed summary judgment on a case involving a failure to train jail personnel on how to deal with inmates suffering from mental illness. <u>Young v. City of Augusta, Georgia</u>, 59 F.3rd 1160 (11th Cir. 1995). Like this case, the 11th Circuit noted that the evidence of the details of the training program is conspicuously absent here. Defendants here take the position Lawson received training at the police academy training, the initial on-the-job training (field training), when he went through training to become a sergeant in 1998 (which focused on criminal investigations), roll call training (where the pursuit policy is read verbatim), and some legal seminars called CIVIL/CRIMINAL LAWS. However, defendants produce no evidence to show that Lawson got any training on pursuits at these events. Nor do the defendants show any sign in sheets to show that Lawson went to this purported training or what curriculum was taught to show what, if any, training was provided on pursuits. Defendant Lawson testifies that there was no training and denies that he ever got trained in pursuits, outside of the police academy training and hearing the policy read verbatim. Furthermore, Lawson testified that he and others complained about the lack of training to supervisors. (Lawson depo at pp. 10, 28-9, 42, 46, 63-4, 76, and 88). <u>See also</u>, <u>Garrett v. Unified Government of Athens-Clarke County</u>, 246 F.Supp.2d 1262 (M.D. Ga.)("the need for more training on proper restraint techniques was so obvious and the lack of such training so likely to result in the violation of constitutional rights, that…there was deliberate indifference"); revs'd on other grounds, 378 F.3d 1274 (11th Cir. 2004).

The 6th Circuit found that a 6-7 hour course and other general training on how to handle the mentally ill was inadequate. <u>Russo v. City of Cinncinati</u>, 953 F.2d 1036 (6th Cir. 1992). <u>See also Johnson v. The City of Richmond</u>, *2005* U.S. Dist. LEXIS 36960

13

(E.D. Va., 2005)(denying summary judgment even though on the ground that there was a lack of post academy training as well as the fact that the recordkeeping on whether the particular officer actually received training in the subject was unreliable).

The Third Circuit recently reversed summary judgment on a failure to train case against a juvenile detention center for failing to train its employees on deescalating conflicts between youths, managing youth behavior generally, dealing with sex offenders and identifying and protecting youth in the population that would be easily victimized, despite the fact that on-the job orientation training was provided.  A.M. v. Luzerne County, 372 F.3d 572 (3rd Cir. 2004).

 In reversing summary judgment on a failure to train case, the 1st Circuit relied on the very same aspect of policy interpretation that we have here and in Kerr infra, stating there was "testimony that the need to train on the always armed/always on duty was **heightened** by the fact that there was some evidence that officers were sometimes unclear what exactly the policy required".  The Young court made that finding even though there was no evidence that there had been no tragic outcomes prior to the incident that was the subject of that case. Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 28, 29 (1st Cir. 2005).

In our situation, not only was there a lack of training, but there was also no testing patrol officers on pursuit policies.  (Lawson depo at p. 46).

## FAILURE TO SUPERVISE

Plaintiffs have sued the County and/or the defendant-Sheriff Crow and Zimmerman in their individual and official capacities for failure to supervise.  Plaintiffs have also sued the individual defendants in their individual capacities as well.   The

failure to supervise claims against the municipality and the failure to supervise claims against the individuals in their individual capacities are analyzed slightly different.

Knowledge of improper conduct and failure to correct the same can result in municipal liability under 1983 for failure to supervise. Mary's Georgia, 787 F.2d 1496 (11th Cir. 1985).   As will be explained in the Shawn Myers incident, the evidence clearly shows that the municipality knew that Lawson strip searched a minor before 5/31/02 and not only did nothing, but tried to cover the incident up afterwards.   The municipality here also is liable for failure to supervise as the evidence shows that everyone in the department knew of Lawson's reckless behavior with initiating chases and not only failed to do anything, include train or reprimand him for such lawlessness.

As to the individual failure to supervise claims, the law from the 11th Circuit predating this incident clearly requires that a supervisor that is aware of the unconstitutional conduct of a subordinate is legally required to take action.   Skrtich v. Thornton, 280 F.3rd 1295 (11th Cir. 2002).   See also, United States v. McKenzie, 768 F.2d 602 (5th Cir. 1985)(officer's awareness of the unconstitutional conduct requires intervention);  Baker v. Monroe Township, 50 F.3d 1186, 1193-94 (3rd Cir. 1995)(evidence sufficient to show that supervisor, in a different room, was aware of how the plaintiff was being treated); Berg v. County of Allegheny, 219 F.3d 261, 276 (3rd. Cir. 2000)(when supervisor knows or should know of reckless conduct and acquiesces thereto and causation is established by showing that action or inaction was taken with deliberate indifference to its known/obvious consequences).   As Baker held, knowledge and acquiescence can be inferred from the circumstances.   Id. a 1194.   Actual knowledge of

15

the risk may be proven by circumstantial evidence if the risk presented was so obvious. Beers-Capitol v. Whetzel, 256 F.3d 120 (3rd Cir. 2001).

      With respect to the individual claims, the law was crystal clear that on May 31, 2002, Lawson's supervisors were required to supervise him.   Skrtich.   None of the individual defendants have set forth any statements of facts contending that they were not Lawson's supervisors on the date in question, except Blackwelder.   However, she apparently is critically involved in the effort to show the the PCSO did not know prior to 5/31/02 that Lawson was violating people's constitutional rights.   The failure to supervise claims include the fact that despite the widespread knowledge of Lawson's proclivity to initiate pursuits, no one did anything to control such reckless behavior.   In fact, just a few weeks before this incident-Lawson generated his own pursuit critique for his own pursuit.   (Ex. 23).   The pursuit policy 41.3, D. 9. requires the pursuit supervisor to generate the pursuit critique of the pursuing officer.   The fact that the PCSO permitted Lawson to critique his own pursuits is further evidence of the lack of supervision both by his individual supervisors and by the PCSO.

      Additionally, his supervisors clearly were on notice that at least one minor had reported that Lawson had strip searched him just a few weeks before this incident. Again, nothing was done except to try and create a record to show that Myers actually reported the incident after the date of the accident.   (See Ex. 11).  Reviewing Myers declaration and deposition shows that he told both Mundell and another police officer of Lawson's conduct and that he went down to the station with both officers to explain what happened.   Interestingly, Mundell's report is dated 5/16/02.   Tom Paige's investigation also corroborates the fact that the PCSO was notified of 5/16/02 of such incident.   Yet

16

Mundell's supervisor, Gloria Blackwelder, who was present with Mundell during the time that Myers reported the incident-writes a report dated 6/12/02. (See Mundell depo at pp. 27-38). Interestingly, Mundell's testimony in her deposition has Myers report to her of Lawson's strip search on 6/12/02 and that the reason that she wrote 5/16/02 on her report was because that date referred to an earlier incident that Mundell experienced with Myers. Nonetheless, Mundell's 5/16/02 report makes no mention of the other incident and it is clear that Myers' Declaration and Paige's initial report (Ex. 12) clearly contravene Blackwelder's 6/12/02 incident report (Ex. 11) and Mundell's testimony raising several factual questions about who knew what regarding Lawson's proclivity to violating individuals' constitutional rights.

Lastly, the evidence clearly shows that Lt. Zimmerman was required to supervise the pursuit. G.O. 41.3, Section D. 5 clearly requires Zimmerman to have supervised Lawson's pursuit and the evidence clearly shows that he not did not supervise Lawson. His deposition in the criminal case of Florida v. Jacoby shows that his explanation as to why he did and said nothing during the 15.8 mile chase, despite assuming that Lawson was going over the speed limit and was close enough to read his license plate to dispatch, was due to the fact that Zimmerman thought that Lawson was experienced and qualified enough not to need supervision. (Zimmerman's deposition at pp. 18-19, 37, 39, 53-54, Zimmerman's deposition Florida v. Jacoby at pp. 13-19, 44-45). Zimmerman's post incident conduct where he goes to the scene of the accident and causes Lawson's vehicle to be removed prior to the traffic fatality investigator also contravenes PSCO policy number 63.1 which required him to leave the vehicle undisturbed until fatality investigators arrived. Post incident conduct is highly probative of deliberate

indifference, especially in the failure to train and supervise context. Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985), cert. denied., 480 U.S. 916 (1987); Bordano v. McLeod, 871 F.2d 195 (7th Cir. 1987). Zimmerman's post event removal of evidence, coupled with Blackwelder's post event front dated report by themselves raises questions of fact on the failure to train and supervise claims.

One thing is certain is that despite Shawn Myers' report, neither the individual defendants nor the PCSO took any action against Lawson between the date of Myers' report and on 5/31/02 when Lawson was permitted to drive in an unmarked patrol car. The 11th Circuit has clearly held that even a small number of prior incidents can be sufficient to impose liability on the municipality, particularly when the investigation of said incidents is missing altogether or is skewed towards absolving the officer. Depew v. City of St. Mary's Georgia, 787 F.2d 1496 (11th Cir. 1985); Vineyard v. County for Murray, 990 F.2d 1207 (11th Cir. 1993); Mary Brown v. City of Margate, 842 F.Supp. 515 (S.D. Fla. 1993).

NEGLIGENCE CLAIMS

Defendant-Lawson clearly violated policies. (See Ex. 4). The evidence clearly shows that the defendants were at the very least negligent in failing to take any action regarding Lawson's proclivity to undertake initiating high speed chases, that he was reported to have strip searched a 15 year old two weeks before this incident, that during the chase-Zimmerman did not supervise at all and certainly was negligent in not taking any steps to inquire into what Lawson was doing chasing Jacoby for such a long period of time over the speed limit.

Plaintiffs also sued defendant-Lawson in his official capacity arguing that he was a policymaker and that his conduct alone (the chase) is imputed to the municipality. Defendants have not raised this issue at all. Lawson's motion for summary judgment was already denied.

This lawsuit's statute of limitations is 2 years and has expired. In the event that the Court enters summary judgment on all claims, including the claims against Lawson, the plaintiffs respectfully request that the Court entertain its supplementary jurisdiction over the pending state law claims.

## COMPARATIVE FAULT/CAUSTION

Defendants argue that the plaintiffs were comparatively at fault and try and show that the cause of the accident was Jacoby's level of intoxication. Comparative fault is not a defense to a 1983 action. Comparative fault is a statutorily created defense to negligence. Bd. Of County Commr's, 117 S.Ct. 1382 (the high degree of predictability may also support an inference of causation. Exhibit 4 clearly shows the obvious, that if Lawson activated his lights or Zimmerman called off the pursuit, the accident that led to Miles White's death would not have occurred.

## EVIDENTIARY QUESTIONS

While plaintiffs cannot project what, if any, questions of admissibility defendant will raise on the evidence submitted in opposition to the motion for summary judgment, the plaintiffs submit that the depositions or testimony of witnesses that were taken in Florida v. Jacoby, Case No. CF02-06695A XX fall under the former testimony exception to the hearsay. Fed. R. Ev. 804(b)(1). Each, defense counsel David Bergdoll, Attorney for the Sheriff's Office, was present at each of these items (as shown from the face page

19

of each transcript), and thus had an opportunity to develop the testimony by direct, cross or redirect examination.

CERTIFICATE OF SERVICE

I CERTIFY that I have electronically filed the foregoing with the Clerk of the Court by using the CM/ECF which will send notice of electronic filing to Jack P. James, Esq. (attorney for all defendants except Scott Lawson) at P.O. Box 3, Lakeland, Fl. 33802 and Scott Lawson, as per the Confidentiality Order by regular mail on this 28[rd] day of March, 2006.

    s/Gregg Goldfarb
GREGG GOLDFARB, ESQ.
FLA. BAR. 0987123
Attorney for Plaintiff
19 West Flagler Street, Suite 703
Miami, Florida 33130
Tel: (305) 579-9725
Fax: (305) 373-3065