# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GARY WHITE, individually and as personal
representative of the Estate of Miles White;
JAMIE WHITE, individually; CAMERON
WHITE, individually; and ADDISON WHITE,
individually,

       Plaintiffs,

v.                              CASE NO: 8:04-cv-1227-T-26EAJ

THE POLK COUNTY; SCOTT LAWSON,
in his individual and official capacities;
COLONEL GARY HESTER, in his individual
capacity; MAJOR SAMUEL TAYLOR, in his
individual capacity; SHERIFF LAWRENCE
CROW, in his individual and official capacities;
LIEUTENANT CRAIG SMITH, in his individual
capacity; LIEUTENANT DAVID ZIMMERMAN,
in his individual and official capacities; COLONEL
GRADY JUDD, in his individual capacity; GLORIA
BLACKWELDER, in her individual capacity;
TIM HOLLYMAN, in his individual capacity; and
JOHN DOES, in their individual capacities;

       Defendants.

_____/

# O R D E R

Before the Court is Defendants' Motion for Summary Judgment filed by the

Sheriff of Polk County, Polk County, Craig Smith, Gary Hester, David Zimmerman,

Gloria Blackwelder, Grady Judd,[1] Samuel Taylor, and Tim Hollyman, the Supporting

Memorandum, the Statement of Undisputed Facts, and numerous affidavits, depositions,

and exhibits (Dkts. 79, 82, 84-90 & 101), and Plaintiffs' Response in Opposition with

numerous exhibits and depositions.  (Dkts. 121, 102-116, S-1, S-2).  After careful

consideration of the submissions of the parties, the entire file and the applicable law, the

Court concludes that summary judgment should be granted on the issue that a

constitutional violation was not established.  The state law claims against Polk County

will be denied without prejudice to refiling in state court.

## Facts

Both parties agree to the following facts.  On May 31, 2002, eighteen-year-old

Adam Jacoby was driving a black Volkswagon Jetta, and sixteen-year-old Miles White

was riding as a passenger in the Jetta some time after 1:00 a.m.  Deputy Sheriff Scott

Lawson, in an unmarked patrol car, conducted surveillance on Jacoby's vehicle for

approximately 15.8 miles.  Deputy Lawson was working his shift and thought the vehicle

may have been stolen.  At some point, the surveillance became a high-speed chase; yet,

Deputy Lawson never turned on his lights or siren and never attempted to stop or pull the

Jetta over.  Deputy Lawson was speeding and disobeying traffic laws, as was Jacoby.

There is no indication in the record that either Jacoby or White knew that they were being

---

[1]   At the time of the incident, May 31, 2002, Grady Judd served as a colonel in the
Polk County Sheriff's Department, and Lawrence Crow served as the Sheriff of Polk
County.  Grady Judd now serves as the Sheriff of Polk County.

chased by law enforcement.  There is, however, evidence in the record that Deputy

Lawson was told by dispatch that Jacoby's car was not stolen.

Traveling in excess of 110 miles per hour, Jacoby's car failed to negotiate a curve

in the road, which was engineered for speeds no greater than 80 miles per hour.  The Jetta

crashed, killing the minor passenger, Miles White.  Deputy Lawson's unmarked patrol car

was removed from the scene of the accident, which was not in conformity with policy.[2]

There was no "pursuit" critique performed on this incident, presumably because Deputy

Lawson did not declare it a pursuit.  In any event, the Sheriff's office determined that

Deputy Lawson conducted his surveillance outside the policies and procedures of the

office and steps were taken for sanctions against Deputy Lawson.

Disputed issues of fact exist as to when the Sheriff's office knew about Deputy

Lawson's proclivity to initiate chases for unjustified reasons, to conduct physicals on

young males under the auspices that he had training as a physician's assistant and such

physicals were condoned by the Sheriff's office, and to commit sexual batteries on

individuals he arrested.  It is clear that after the incident of May 31, 2002, many victims

came forward with complaints.  There is also evidence that Deputy Lawson conducted an

unnecessary strip search of a fifteen-year old male on May 16, 2002, two weeks before

---

[2]   This fact creates an innuendo that the patrol car may have hit Jacoby's car and
then been altered in some form to cover up any signs of collision.  This innuendo is
promulgated by Plaintiffs, and there is no evidence in the record to support this claim.

the incident at issue.  Defendants dispute that the Sheriff's office became aware of that incident before the May 31st accident.

Adam Jacoby was prosecuted by the state in <u>State of Florida v. Adam Jacoby</u>, No. CF02-06695A-XX, in the Tenth Judicial Circuit in and for Polk County, Florida.  Deputy Scott Lawson was deposed in that case while in prison, and asserted the Fifth Amendment on most of the questions.  (Dkt. 109).  When Deputy Lawson was questioned at his deposition in this case about whether the chase was initiated with the intention of causing harm to Jacoby and White, he asserted his Fifth Amendment privilege against self-incrimination.  (Dkt. 87 at 66—"[Question:] During the incident which is referenced in Exhibit No. 1, was it your intent to harm Adam Jacoby and Miles White? [Answer:] We'd object to the question, and he declines to answer it based upon his Fifth Amendment privilege, because any answer he may give may tend to incriminate him.").[3]  Plaintiffs claim that a negative inference attaches to this colloquy in that Scott Lawson did possess the requisite intent to meet the culpability standard for high-speed chases discussed below.

### Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[3]  In Defendant Scott Lawson's pro se motion for summary judgment, however, he alleges that "at no time during the alleged pursuit did Defendant intend to worsen the legal plight of the driver or passenger as there was no intent to sexually or physically assault them."  (Dkt. 30 at para. 10).

Fed.R.Civ.P. 56(c).  The facts must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  See Brosseau v. Haugen, 543 U.S. 194, 195 n. 2, 125 S.Ct. 596, 597 (2004); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).  Although generally inadmissible hearsay "cannot be considered on a motion for summary judgment," every general rule has its exceptions, permitting the Court to sometimes consider hearsay at the summary judgment stage.  See Macuba v. Deboer, 193 F.3d 1316, 1323-24 (11th Cir. 1999).

## Polk County as Proper Party

Defendants argue that Polk County cannot be sued in this § 1983 action because it is not subject to suit under the particular scenario of this case.  Defendants rely on Bailey v. Wictzack, 735 F.Supp.2d 1016 (M.D. Fla. 1990), McMillian v. Monroe County, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), McMillian v. Johnson, 88 F.3d 1573 (11th Cir. 1996), Lucas v. O'Loughlin, 831 F.2d 232 (11th Cir. 1987), and Stricker v. Kuehl, 26 F.Supp.2d 1344 (M.D. Fla. 1998), aff'd in part and rev'd in part on other grounds, 234 F.3d 32 (11th Cir. 2000), in an unpublished opinion.  This Court has addressed the seeming inconsistency between Lucas and Stricker in its prior order in this case entered October 1, 2004.[4]  Since that time, as Plaintiffs point out, the Eleventh Circuit has decided Abusaid v. Hillsborough County Bd. of Comm'rs, 405 F.3d 1298 (11th Cir. 2005), which, although specifically deciding a Florida sheriff's liability under §

---

[4]  See docket 28.

1983 in the enforcement of a county ordinance, sheds light on how to determine whether a county may also be a proper party.

The Eleventh Circuit in Abusaid reaffirmed the "continuing validity" of the analysis employed in Hufford v. Rodgers, 912 F.2d 1338 (11th Cir. 1990),[5] despite the subsequent en banc decision of Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003), and the Supreme Court's decision in McMillian.  Abusaid, 405 F.3d at 1304-05.  While recognizing that there is no longer an "across the board" determination that Florida sheriffs are not arms of the state, the Eleventh Circuit held that the four-factor test applied in Hufford remains intact and must be administered by a function-by-function approach. Id. at 1304-05.  The four-factor test to resolve whether the sheriff is an arm of the state for any particular case encompasses determining first, how state law defines sheriff, second, the degree of state control over the sheriff, third, the source of the sheriff's funding, and last, whether the state's treasury would be burdened by an adverse verdict against the sheriff.

Under the first factor, Florida law, both under its constitution and cases, clearly defines a sheriff as a "county officer."  Skipping to the third factor, sheriffs are funded entirely by county taxes and are required to pay to the county any fees, commissions, or other money earned by the office.  Abusaid, 405 F.3d at 1310-11.   Under the fourth

---

[5]   In Hufford, the panel correctly applied the four-factor test to determine that the sheriff in that particular case was not an arm of the state and therefore not entitled to immunity from a § 1983 suit in federal court.  Abusaid, 405 F.3d at 1304.

factor, the <u>Abusaid</u> court cited <u>Lucas</u> for the proposition that counties may be held liable for a judgment against a sheriff, and as such, the state coffers are not burdened by a judgment against the sheriff.  <u>Id</u> at 1313.

The second factor— the state control over the sheriff—  presents a closer call, however.  It is axiomatic that an official or entity may be a final policymaker with respect to some actions and not others, and also that final policymaking authority may be shared by more than one official or body; for example, the county and the sheriff.  <u>See</u> <u>McMillian</u>, 88 F.3d at 1578-79, 1583, citing <u>Pembaur v. City of Cincinnati</u>,  475 U.S. 469, 483 n. 12, 106 S.Ct. 1292, 1300 n. 12 (1986), and <u>City of Louis v. Praprotnik</u>, 485 U.S. 112, 126, 108 S.Ct. 915, 925 (1988).  The <u>McMillian</u> court reasoned that the county sheriff could be a final policymaker for the state of Alabama in the area of law enforcement insofar as Alabama law gives sheriffs unreviewable state law enforcement power.  <u>Id</u>. at 1579.  The Supreme Court affirmed <u>McMillian</u>, recognizing that "States have wide authority to set up their state and local governments as they wish" and that "there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State and not in another."  <u>McMillian</u>, 520 U.S. 795, 117 S.Ct. at 1741-42. In <u>McMillian</u>, the § 1983 violations involved the sheriff's intimidating a witness into making false statements and suppressing exculpatory evidence.

Defendants categorize the conduct of the Polk County Sheriff in this case as falling under his final policymaker functions in the area of law enforcement and therefore acting as an arm of the state and not the county.  Some of the cases cited in <u>McMillian</u>, however,

lend support to a finding that creating the policies regarding training deputies, and perhaps devising pursuit policies, does not fall under the broad category of law enforcement. A review of three cases cited by the Supreme Court in McMillian from other states interpreting other state laws and constitutions with respect to whether the area of training sheriffs' deputies falls under county duties or state duties, proves beneficial. See McMillian, 520 U.S. at 795 n. 10, 117 S.Ct. at 1742 n. 10. First, in Davis v. Mason County, 927 F.2d 1473, 1480 (9th Cir. 1991), the court held that under Washington state law where the sheriff is "the chief executive officer" and "the conservator of the peace of the county," the sheriff's authority with respect to training deputies constitutes making county policy. Relying on Supreme Court precedence, the Ninth Circuit explained:

> [A] Sheriff can be the official policymaker regarding law enforcement practices without having final authority over all of its employees' employment practices. . . . The training of peace officers on the use of force is a type of law enforcement practice that falls squarely within the policymaking authority of a County Sheriff.

Davis, 927 F.2d at 1481.

Second, in Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990), under the "unique structure of county government in Texas," the Texas sheriff sets county policy in the area of law enforcement. Turner did not involve the enforcement of a state or county law, but rather the abuse of the sheriff's powers "inherent in his role as chief policymaker for how the peace would be kept in Upton County." Id. at 137 n. 2. "Holding the county liable for the actions of its sheriff under these circumstances does not run afoul of

Monell's admonition against *respondeat superior* liability on the part of the county for the actions of its employees." Id. at 137.

Finally, in Crowder v. Sinyard, 884 F.2d 804, 828 (5th Cir. 1989),[6] the Fifth Circuit recognized that Arkansas law provides for the sheriff to set county policy in the area of law enforcement.  In Crowder, the county was held liable under § 1983 for the sheriff's final policymaking authority "with regard to the actions of their respective counties' law enforcement officials' activities outside their jurisdictions and that they were authorized and responsible under Arkansas law for establishing policies and procedures regarding such activities."  Id. at 829.  There, the complained of search and seizure involved a sheriff who crossed the county line, arguably beyond the authority and control of the county.  Nevertheless, under Arkansas law, the sheriff's duties include establishing county policies and procedures "covering the conduct of departmental officers when they cooperate with, or perform actions in conjunction with, officials from outside the county."  Id. at 828.

Against this backdrop, Abusaid provides further guidance to a consideration of the second factor regarding state control over sheriffs in Florida.  Generally, as set forth in great detail in Abusaid, Florida law gives sheriffs great independence and counties retain the "substantial discretion over how to utilize that office" including the constitutional grant of power to the county to decide to abolish the office of sheriff if so desired.

---

   [6]  See McMillian, 520 U.S. at 795 n. 10, 117 S.Ct. at 1742 n. 10.

Abusaid, 405 F.3d at 1306-07.  If the sheriff, however, is carrying out any one of the

enumerated functions listed under section 30.15 of the Florida Statutes, then the sheriff

*may* be acting as an arm of the state, but "[t]he key question is not what arrest and force

powers sheriffs have, but *for whom* sheriffs exercise that power."  Abusaid, 405 F.3d at

1310, quoting Manders, 338 F.3d at 1319 n. 35 (emphasis in original).[7]  A review of

section 30.15 reveals that the sheriff acts on behalf of the county when executing process

of county courts and the board of county commissioners and when maintaining "the peace

in their counties."  § 30.15(1)(e), Fla. Stat.  Nothing in section 30.15 or any other

provision of Florida law dictates that the training and supervising of deputies falls under a

function required by the state, as opposed to the county.  Thus, the actions complained of

in this case do not fall under the category of law enforcement for the state, but rather fall

under the category of policymaking for the county.

      Having considered all four factors as dictated by Abusaid, the Court concludes at

this juncture, that the Sheriff was about the business of the county government in the

alleged inadequate training and supervision of his deputies with respect to pursuits, or

"surveillance" if that be the case.  In other words, the aspects of policies regarding

training and supervision may be considered more along the lines of local, administrative

---

    [7]  The Abusaid court references two specific examples of a sheriff's functions that
may constitute acting as an arm of the state: (1) serving state process, as opposed to
county process; and (2) implementing an antidiscrimination policy.  Id. at 1310.

duties as opposed to broad state duties of law enforcement.  Summary judgment is

therefore denied with respect to Polk County being removed as a party Defendant.

### Constitutional Violation

Before reaching the issue of the existence of a custom, policy, practice or

procedure on the part of the sheriff or county, the existence of a constitutional violation

must be shown.  The alleged acts of Defendants must have caused Plaintiffs to suffer a

deprivation of a right, privilege or immunity, guaranteed by the Constitution or laws of

the United States.  Defendants assert that a constitutional deprivation cannot be

established under either the "shocks-the-conscience" cases or the "unreasonable seizure"

opinions involving law enforcement's high-speed vehicle chases.

Defendants cite numerous cases in their memorandum for the proposition that

rarely, if ever, does a high-speed chase shock the judicial conscience in the constitutional

sense.  The seminal case for high-speed chases is County of Sacramento v. Lewis, 523

U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), in that it sets forth the applicable

shocks-the-conscience standard, which requires a greater amount of culpability than

deliberate indifference or reckless disregard.  The Supreme Court granted certiorari to

resolve a conflict among the circuits regarding the degree and measure of culpability

necessary for a law enforcement officer to violate substantive due process in a pursuit

case.  Id. at 1713.  Because the Fourth Amendment covers only searches and seizures, the

due process clause of the Fourteenth Amendment must be used in cases where a seizure

does not occur.  Id. at 1715 (holding that Fourth Amendment seizure occurs "only when

there is a governmental termination of freedom of movement *through means intentionally applied*") (citation omitted).

First, the Court will address the law regarding "seizures" under the Fourth Amendment.  Under the case law defining "seizures" in the context of high-speed chases, law enforcement's actions must amount to a "means intentionally applied" to terminate the individual's freedom.  See Troupe v. Sarasota County, 419 F.3d 1160 (11th Cir. 2005) (holding that where officers fired at the fleeing car and hit the driver in an attempt to stop the car, the two passengers in the fleeing car were not seized).  An officer or deputy's car or roadblock or gunfire must hit or stop or come into contact with the victim for a "seizure" to occur.  See Vaughan v. Cox, 343 F.3d 1323, 1328-29 (11th Cir. 2003) (finding that where officer discharged his firearm and bullet hit passenger in fleeing car, the passenger was seized); Harris v. Coweta County, 433 F.3d 807, 812 (11th Cir. 2005) (holding that suspect in high-speed chase was seized when officer rammed suspect's vehicle, causing suspect to lose control and crash) (and cases cited therein).  Situations, like the instant case, in which a victim is injured when the car he is either driving or riding in loses control and collides with an a object other than a barricade or block set up by law enforcement to stop the particular suspect, do not constitute "seizures" because there is no "means intentionally applied" to stop the individual fleeing.

More specifically, the record, as it stands, does not establish a "seizure" in this case, because Adam Jacoby lost control of his car and ran into something other than a roadblock or obstacle instituted by law enforcement.  Although Deputy Lawson's

-12-

unmarked patrol car was removed from the scene and was not examined by the

designated investigator until five days after the accident, there is no evidence at this point

to suggest that Deputy Lawson's patrol car ever hit Adam Jacoby's Jetta.  That other

evidence may be revealed in the future to establish that the patrol car hit the Jetta is

nothing more than a hope or perhaps pipedream on the part of Plaintiffs at this stage of

the proceedings. Consequently, the Plaintiffs cannot obtain redress under § 1983 based on

the Fourth Amendment and must therefore rely solely on the substantive due process

clause of the Fourteenth Amendment.

   The applicable standard to apply under the Fourteenth Amendment in high-speed

chase cases[8] is whether the conduct of the government shocks the judicial conscience. <u>See</u>

<u>Lewis</u>.  Lewis reiterates the substantive due process concept of protecting individuals

from the "arbitrary exercise of the powers of government."  <u>Lewis</u>, 118 S.Ct. at 1716

(citing <u>Hurtado v. California</u>, 110 U.S. 516, 527 (1884)).  The Supreme Court specifically

held in <u>Lewis</u> that "high-speed chases with no intent to harm suspects physically or to

worsen their legal plight do not give rise to liability under the Fourteenth Amendment,

---

   [8]   Defendants employ the word surveillance when referring to the incident of May
31, 2002, to stress that any member of the sheriff's office would not have known that
Scott Lawson was executing a pursuit, thereby triggering the appropriate pursuit
procedure and protocol governing supervision of pursuits.  Regardless of the semantics
advocated by each side, the record is clear that both vehicles were traveling at
phenomenal and dangerous rates of speed over 100 miles per hour.  There is no question
that this case involves a high-speed chase under any spin on the facts and any resolution
of a constitutional violation must be governed by the shocks-the-conscience standard
applicable to high-speed police chases.

redressable by an action under § 1983." <u>Lewis</u>, 118 S.Ct. at 1720.  The Court cited

<u>Checki v. Webb</u>, 785 F.2d 534, 538 (5th Cir. 1986), for a comparison between an officer's

negligent use of his vehicle, which does not lead to § 1983 liability, and the officer's

"intentional misuse" of his vehicle, which could lead to liability.  <u>Lewis</u>, 118 S.Ct. at

1720 n. 13.  The <u>Checki</u> court hypothesized that "where a police officer uses a police

vehicle to terrorize a civilian, and he has done so with malicious abuse of official power

shocking to the conscience, a court may conclude that the officers have crossed the

"constitutional line."  <u>Checki</u>, 785 F.2d at 538.

Many courts have applied the shocks-the-conscience standard to situations

somewhat like the instant one.  In <u>Fagan v. City of Vineland</u>, 22 F.3d 1296, 1306-07 (3rd

Cir. 1994), the court held that a high-speed pursuit through a residential neighborhood

resulting in the death of the occupants of a second car that the pursued suspect hit did not

pass the shocks-the-conscience test.  There, it was irrelevant that the officer ignored

traffic signals and violated policy by failing to respond to a supervisor's request for an

explanation.  Similarly, in <u>Smith v. Lexington Fayette Urban County Gov't</u>, 884 F.Supp.

1086 (E.D. Ky. 1995), the court held that an off-duty officer who pursued a drunken

driver in a high-speed chase which resulted in the death of a pedestrian who was struck by

the chased car did not shock the conscience.  In <u>Smith</u>, the plaintiffs alleged that the

accident was not fully investigated, as the Plaintiffs allege here, and that none of the

officers involved used lights or sirens, which represented an abuse of policy resulting in

police misconduct.

Most importantly, the Eleventh Circuit, although finding that jury issues remained with respect to a viable Fourth Amendment seizure, has held that a deputy's firing a gun and wounding the passenger of a truck in an attempt to pull the misidentified suspects in the truck over, did not present a substantive due process claim.  See Vaughan v. Cox, 343 F.3d 1323 (11th Cir. 2003).  Following Lewis, the Vaughan panel concluded that the facts did not show that the officer had "a purpose to cause harm unrelated to the legitimate object of arrest."  Vaughan, 343 F.3d at 1333.  The court wrote that the wounded passenger "has not presented any evidence to suggest that [the deputy's] actions were motivated by anything but the desire to arrest [the passenger and the driver of the truck]."  Id. at 1333.[9]

It is true that if Deputy Lawson tracked Jacoby and White down with the intention of committing a crime on them, then this case would be more akin to the brandishing of a firearm by law enforcement referred to in Checki.   Id., 785 F.2d at 538.  The Checki court surmised some scenarios in which the "constitutional line" may be crossed to shock the judicial conscience: "A police officer who terrorizes a civilian by brandishing a cocked gun in front of the civilian's face may not cause *physical injury*, but he has certainly laid the building blocks for a section 1983 claim against him.  Similarly, where a police officer uses a police vehicle to terrorize a civilian, and he has done so with

---

[9]   See also Troupe, 419 F.3d at 1167 (holding that force "regardless of the form directed to a driver of a vehicle— particularly one attempting to flee— does not give rise to a due process deprivation claim unless it was exercised with a 'purpose to cause harm' unrelated to the legitimate object of arrest.").

malicious abuse of official power," the judicial conscience may be shocked.  Id. at 538

(emphasis in original).  At some point, there comes a time, even in a high-speed chase, at

which the abuse of the law enforcement officer is so clear that the judicial conscience is

shocked.  This Court will leave that determination for another day and another case with

more egregious facts than this one.  Here, there is no indication in the record that Jacoby

or White had any idea Lawson intended to commit a crime on them, nor did Lawson

admit that he intended to commit any crime upon them.

Plaintiffs contend that the accident could have been avoided had Deputy Lawson

simply turned on his lights and siren and pulled Jacoby over.  Such is noted by a captain

of the sheriff's office in his report.  Whether the accident could have been avoided,

however, is not part of the analysis with respect to shocking the conscience.  See

Magdziak v. Byrd, No. 94-C-1876, 1995 WL 704394 at *5 (N.D. Ill. Nov. 29, 1995)

(holding that during high-speed chase where state trooper failed to use oscillating lights

and siren and innocent driver of second car was fatally injured in collision with suspect

being chased, fact that state trooper did not terminate chase was not considered in

whether chase was conscience-shocking).[10]  The record before this Court, taking the

evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in

---

[10]   See also Temkin v. Frederick County Comm'rs, 945 F.2d 716, 724 (4th Cir.
1991) (holding conscience not shocked where chase continued for ten miles at very high
rate of speed initiated because of minor violation and in violation of policy requiring
officer to maintain radio contact with supervisor throughout chase).

favor of Plaintiffs, does not support a finding that meets the weighty standard of shocking the judicial conscience.

Because there is no finding of a constitutional violation on the part of Scott Lawson, the person being supervised, the Court need not inquire into the particular policy of the sheriff's office or analyze the claims of inadequate training and supervision.  See Rooney v. Watson, 101 F.3d 1378, 1382 n. 2 (11th Cir. 1996) (holding that automobile accident involving on-duty deputy sheriff not involved in high-speed chase causing serious injuries to passengers in car hit did not give rise to violation of constitutional rights and therefore failure to train officers claim could not be maintained absent constitutional deprivation and governmental policy or custom which led to accident need not be addressed).  Even if this Court were to entertain argument regarding a policy of failing to correct offensive actions of Deputy Scott Lawson, the record does not substantiate a finding that the final policymakers of the sheriff's department were aware of past misconduct, in particular conducting physicals on males under the guise of Lawson's authority to conduct same and strip-searching young males without cause.  See Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987) (holding that city's policy regarding citizens' complaints filed regarding officer did not deprive plaintiffs of their constitutional rights).[11]

---

[11]   In short, the record lacks evidence of past deputy misconduct resulting from a lack of training or supervision in pursuit policy, such as not using lights or sirens or declaring a pursuit was in progress.  See Cannon v. Taylor, 782 F.2d 947, 951 (11th Cir. 1986).

**Claims against Lawson**

This Court is aware that Lawson does not have an attorney.  Indeed, this Court

denied his pro se motion for summary judgment.  <u>See</u> dockets 30 & 31.  Based on the

arguments made on behalf of all other Defendants in this case, and based on the fact that

for purposes of § 1983 claims, Lawson was performing the discretionary functions of his

job while he was on-duty, the Court finds that Lawson should obtain the benefits of this

ruling granting summary judgment with respect to whether a constitutional violation was

committed.

**Pendant State Claims Against Polk County**

Federal law permits, and even encourages, district courts to refrain from ruling on

purely matters of state law under supplemental jurisdiction.  <u>See</u> 28 U.S.C. § 1367(c)(3);

<u>Baggett v. First Nat'l Bank</u>, 117 F.3d 1342, 1353 (11th Cir. 1997) (holding that dismissal

of state law claims is strongly encouraged where the federal claims are dismissed prior to

trial).  Where the Court declines to exercise supplemental jurisdiction over such claims,

the claims should be dismissed without prejudice so they can be refiled in the appropriate

state court.  <u>See</u> <u>Crosby v Paulk</u>, 187 F.3d 1339, 1352 (11th Cir. 1999).

Plaintiffs urge this Court, however, to exercise its supplemental jurisdiction to hear

the state claims remaining, as opposed to dismissing the claims without prejudice,

because the statute of limitations has run.  Plaintiffs need not be concerned about the

limitations period.  Section 1367(d) of Title 28 of the United States Code provides that
"[t]he period of limitations for any claim asserted under subsection (a), and for any other
claims in the same action that is voluntarily dismissed at the same time as or after the
dismissal of the claim under subsection (a), shall be tolled while the claim is pending and
for a period of 30 days after it is dismissed unless State law provides for a longer tolling
period."  Thus, Plaintiff has at least thirty days from the date of this order to refile the
state claims in state court.  Resolving that Plaintiffs will suffer no harm by this Court's
declining to exercise its supplemental jurisdiction, and in the interest of judicial economy
and convenience, the Court declines to exercise supplemental jurisdiction over the
remaining state law claims in this action.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)    Defendants' Motion for Summary Judgment with respect to Polk County
       (Dkt. 79) is **DENIED**.

(2)    Defendants' Motion for Summary Judgment with respect to whether
       material issues of fact exist regarding the shocks-the-conscience standard
       under the Fourteenth Amendment (Dkt. 79) is **GRANTED**.  All other
       aspects of the Motion need not be reached and are therefore denied as moot.

(3)    All claims with respect to Defendant Scott Lawson are ruled upon in the
       same manner as the other Defendants.

(4)     The Clerk shall enter judgment in favor of all Defendants and against

Plaintiffs on all § 1983 claims.  All state law claims against Polk County

shall be denied without prejudice to refiling in state court.

(5)     The Clerk is directed to close this file.

**DONE AND ORDERED** at Tampa, Florida, on April 21, 2006.


    s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


COPIES FURNISHED TO:
Counsel of Record

-20-